at all. Thank you very much, Madam Clerk. Mr. Gorson, good to have you with us, sir. Good to be here. Thank you, Your Honor. And on behalf of the Wake Forest Appellate Clinic and under Local Rule 46, it's my pleasure to introduce the student council who are appearing here today, Katie Kesters, who will be doing the opening argument, and Nayeli Selkis, the rebuttal. And also with us is Will Boyce, who is on the reply brief. Thank you all very much. Very good. Thank you all. All of you. We're good to... It's great to have you with us. Let's see. Ms. Kesters, you're up first. I'd be pleased to hear from you. You represent Mr. Roberts? Yes, Your Honor. May it please the Court, good morning, Your Honors. Katie Kester is on behalf of Stephen Roberts, along with my co-counsel, Nayeli Selkis. And he's in a prison called Red Onion? Yes, sir. He's in Red Onion State Prison. You know where that's located? Your Honor, it is in the state of Virginia. I'm not sure exactly where in the state of Virginia. It's way out there. You're in Richmond now, and it's way out there. Yes, sir. It's almost... I don't think it's as far as King Mountain, but it's almost in Kentucky and West Virginia. Yes, sir. It's way out there in the western area. Do you know what kind of a prison it is? I believe it's maximum security, Your Honor. Pardon? It's a maximum security facility. It is the maximum security? I'm not sure if it's the, but it is a maximum security facility. It's a maximum security facility. Yes, Your Honor. And with the Court's permission, I would... So that would mean it has what we might call the worst prisoners that the Commonwealth of Virginia holds? They've been determined to be the most dangerous that the Commonwealth might hold. And so with the Court's permission, I would like to reserve five minutes for rebuttal from my counsel. I guess that whole colloquy there brought something to my mind, is you've never seen your client. No, Your Honor, I have never seen my client. I wonder if Wake Fox would consider that when you represent someone, it would be kind of nice to... I guess maybe video or some kind of way you've actually seen your client. Yes, Your Honor. It would be nice, but Professor Corzine speaks regularly with Mr. Roberts and can pass along his conversation. He has been there. He knows. Yes, sir. He knows you're here for him. Yes, Your Honor. He's aware that we're arguing today. And I'm sure he appreciates that. Yes, Your Honor. So today, I would like to focus on the free exercise claim and anything else the Court would like to discuss. But before turning to the free exercise claim, I'd just like to spend a minute or so talking about the basis for these claims and what exactly happened to Mr. Roberts. So he is an Orthodox Sunni Muslim who practices Ramadan fasting, and he also follows the Orthodox Jewish standards of the cash route. And the only diet at the Red Onion facility that comports with his religious dietary needs is the Orthodox Jewish kosher diet, or the OJKD, as is referenced several times. So this whole case is about the food served in the Red Onion cafeteria? Yes, Your Honor. It's about the OJKD that Mr. Roberts was on that comports with his cash route beliefs, as well as the ability to receive that diet on the Ramadan fasting schedule. And so that 30 days of Ramadan, whether or not he was able to receive. And in 2020, which is the year of the issue here, he was not able to receive that OJKD, his religious diet, on the Ramadan fasting schedule. He requested on the first day available on March 10th to receive that diet. He received three separate forms of approval from prison officials. And then the day before Ramadan started, April 23rd, he was approached by a VDOC counselor who told him he either had to choose. He could either participate in fasting and remain and change his diet to the common fair and remain on that non-compliant diet for six months, or he could not participate in Ramadan and not participate in Ramadan fasting, which is a core tenant of his Islamic faith and receive the first request was in March of 2020. Yes, Your Honor. March 10th of 2020. That's when the Ramadan request forms came out. So that's the first available date that he was able to go through the official process. So about a month and a half before the beginning of Ramadan is when he requested the Ramadan fasting. He had also been on Ramadan fasting since he arrived at Red Onion in 2006. So he had been on it for years. So the diet wasn't the issue. It was the schedule of the diet, as I understand it. The prison said they couldn't give it to him within the scheduling that would allow him to participate in fasting, which is one of his religious tenets, particularly during Ramadan. Yes, Your Honor. So he was able to receive the OJKD for the remainder of the year, but the prison told him that the OJKD was not served during Ramadan so that he would not be able to receive that diet during Ramadan. They gave him options. They gave him options that were non-compliant with his religious beliefs. Was one of those options compliant? No, Your Honor. So the two options that were presented to him at the time of the denial were either to stop receiving the meals that he, that were, that comported with his religious diet. So he would go back to the common fair diet, which does not comport with Kashrut, which are his religious beliefs. So that was the first option. He would have had to stay on that diet for six months. And at that point, he then would have had to request to be put back on the diet. So he would have been out of compliance with his religious beliefs for six months if he had chosen that option. The second option that they gave him was to remain on that diet, the OJKD, but to not participate in Ramadan fasting for that month, which Ramadan fasting is a core pillar, one of the five pillars of Islam. It's a very central part of his belief system. And so those were the two options that were presented to him at the time. He wanted a Jewish diet during Ramadan. Yes, Your Honor. And on the face of it, for folks that don't understand some of this, it doesn't make a lot of sense. And I think maybe the district judge indicated that that, what I said, it didn't make a lot of sense. But, but these are the facts. Your Honor, the district judge did find that there was a constitutional violation here. And part of that was that these were the sincerely held religious beliefs of Mr. Roberts. So whether or not the diet makes sense or seems to make sense in our heads. He said it violated one prong of the First Amendment. Yes, Your Honor. He said that the free exercise clause was violated. Free exercise clause of the First Amendment. Yes. Judge Jones. Yes, Your Honor. Of the Western District of Virginia. Yes. A very able judge, and he wrote a comprehensive opinion. Yes, Your Honor. And he decided that there was a constitutional violation here, that there was a sincerely held religious belief of Mr. Roberts, and that there was a substantial burden. And so he held that there was a constitutional violation. What he did not find was that there was a clearly established right. Back on that, we talked about that some already today. Yes, Your Honor. A clearly established prong you're very familiar with. Yes, Your Honor. And we would argue that it is clearly established here, and that the prison officials were wrong. Your argument is that the district court defined the right too broadly. Is that correct? The district court defined the right too narrowly. I'm sorry, too narrowly. Yes, Your Honor. And so what we would contend here is that the right at issue is whether Mr. Roberts had the right to receive a diet consistent with his religious scruples. And how did the district court define it? The district court defined it the same way that the defendants are asking for here, which was a Sunni Muslim inmate's constitutional right to receive meals supervised by an Orthodox Jewish rabbi as part of his Muslim Ramadan observance. Oh, right. You couldn't get more narrow than that. And that's very narrow, Your Honor. And you read that from his opinion? I believe what I'm quoting there is from the appellee's brief, but they were quoting the district court. So it was something very... I just want to make sure when we're referring to the district court that we get his words correct. I am quoting the appellee's brief. I believe they were quoting exactly what the district court said, but the district court defined it essentially the exact same way as what I just read. But your argument is that the right at issue is the right to a nutritionally adequate diet that's consistent with his religious beliefs. We're saying a diet consistent with his religious scruples. And so that's the definition from this court's precedent in Lovelace v. Lee in 2006. So we're not asking this court to apply a novel definition, but just to apply its own definition from Lovelace. And this court has used that definition several times since. For example, Wall v. Wade in 2014, both Lovelace and Wall v. Wade involved an inmate who was attempting to practice Ramadan fasting. And then recently in an unpublished case, Coleman v. Jones, this court in 2022 applied the nutritionally adequate diet consistent with religious scruples. And that was specifically looking at whether the common fair diet was nutritionally adequate. When I first looked at this case, I had to really go and try to figure out what was he asking for because it seemed a little inconsistent when I saw the Muslim Ramadan and then at the same time the orthodox Jewish diet. It seems like, well, those are kind of two different things. And typically you don't get a request like that. It is somewhat unusual, but I guess there you have to be in the public domain. It's not unheard of, but it's unusual. And then the prison system itself has to do this within weeks, accommodate the religious followings of his various individuals. It could be many, many. And you can imagine if you had a hundred of these things out there. So when you get down to it, the question then becomes, because, and I'll jump ahead, ultimately they did correct it. They were able to do it at some point in time. But it seems to me in terms of, and I'm not sure that this court even did a turnaround analysis on this, when you get to the penological justification part of this, it seems to me that when a prison is faced with that kind of, I will call it a different type of request, I think we can all agree that, that it's not a typical thing to ask for one religion and another to do that, the two together, that under these circumstances to not be able to move forward and seek to try to work with it, it seems like maybe that cuts against you a bit. Yes, Your Honor, I take your point, but there weren't any real justifications for the denial. It was about a month and a half that they would have had to accommodate this request. And the defendants, although not making this argument below, have now asserted that they would have had to create an entirely new menu. So there are all these things they've listed in the brief that What's the month and a half? The whole thing or the notice? Your Honor, when he requested on March 10th, he then, Ramadan began I believe on April 24th, it was a month and a half. So you're talking about the amount of notice? Yes, Your Honor. And he was already receiving the OJKD diet, right? He had been receiving the OJKD since the summer of 2019. Right, that's not the problem. They could do that. They'd proven they could do that. That's what he'd been receiving for years. The problem was they wouldn't give it to him on the schedule that would allow him to fast for Ramadan. Yes, Your Honor. That's the issue. And so when the defendants are citing all of these things that they would have had to do, we would just contend that that's untrue. The OJKD was already a diet that was served in the prison. It's already something that they knew was nutritionally adequate that complied with the standards of cash route. It was already served. They were already prepared to serve meals on the Ramadan fasting schedule. They had the staff to do that. They knew that they would be compliant with the Ramadan fasting schedule. All that Mr. Roberts was requesting was to take those meals that they already have and simply serve them on a different schedule. You argue that they lied to him? No, Your Honor. They said they couldn't comply with what they couldn't do? What did he want out of that? No, Your Honor. And at the time of the denial, they didn't assert any of these things, any of these resource constraints or things like that. They simply said. They didn't argue that to the district court either? No, Your Honor. They did not state that at the time of the denial. They did not argue it to the district court. Now in the briefing, they're asserting all of these things that they would have had to do. But that's not what Mr. Roberts asked for. He didn't ask for a new menu. All of these things wouldn't have to have been created. He simply asked them to take already existing meals and serve them. What do you want us to do, Your Honor? First, we would like you to apply the Turner factors. Judge Wynn is correct in noting that the district court did not apply the Turner factors, simply found the constitutional violation. So we'd like this court to apply the Turner factors. But even so, even if the Turner factors are not applied here, there are disputes of material fact and summary judgment is not appropriate at this point in the litigation. So we would ask you to reverse and remand. What remedy? For what? That's what I'm wondering. What do you want us to do? Remand for damages? Yes, Your Honor. Under what? For a trial? Under his 1983 claim in the suit against the prison administrators in their individual capacity. A violation of what constitutional act? For free. We have contended free exercise, establishment clause, and equal protection. So for any of those three constitutional issues to receive damages under 1983. So you think we should apply the Turner test to the establishment clause? The Turner test definitely applies. There's a bit of confusion in the case law about what the Turner factors apply to. They apply to the free exercise clause. They seem to apply to the equal protection clause. But they have never been applied to the establishment clause. I don't know how the Turner factors are going to help you. Tell me how that's going to help you apply the Turner factors here. Well, we would contend that the district court reached the correct conclusion in determining that there was a constitutional violation. But without considering the Turner factors, we do concede that the Turner factors do apply to free exercise litigation. I thought the district court ruled against you on qualified immunity. Yes, because of the clearly established framework. Because in your view, the district court defined the right too narrowly. Yes, Your Honor. So you Yes, Your Honor. We would have you reverse and hold a trial for damages. Yes, sir. Against the warden. Yes, sir. Against all of the parties that are named in the brief. So I believe it's the director responsible for this. I mean, do you need more discovery? How do you figure out what you're going to have a trial and where are you going to have it? Where are you going to have this trial? Your Honor, I see that my time has expired. May I answer your question? Answer the questions as long as you get them. The trial, I believe, would be in the Western District of Virginia. Yes, Your Honor. So either Abington or Roanoke, probably. Judge Jones used to be, I don't know whether he still worked with Hardin or not. He may be a senior judge. He's been around a long time. He's a terrific judge. He went to Duke, as a matter of fact, I mentioned to you when you were at North Virginia. So I believe, Your Honor, I believe it would be held in the Western District, and the defendants we have here are a VDOC counselor. We have the director of food service who gave the direct order that he would not receive the diet. Like the kitchen sink, he's trying to hold everybody liable for this thing. It's never happened again. That's correct, Your Honor. It's probably never going to happen again. And the fact that it never happened again. And they're going to have a jury down in Western Virginia trying to figure out how many, how much damages to assess. Yes, Your Honor, and in terms of the damages, he was sick. It was mental anguish throughout the entirety of him not being able to comply with his own religious beliefs. So that's what we're asking. And those dangerous prisoners are going to have to be moved around if they're going to go to trial down in Western Virginia. This is not a... Well, Your Honor, we are asking for him to have the opportunity to present his case in front of a jury for damages for what was a fairly egregious constitutional violation to force this individual... Maybe I'll rebuttal to make it clearer in terms of the damages. I think it's pretty clear under this Religious Land Use Act, you don't get it in the official capacity. We agree with that. So I'm not sure it's been fully decided, totally decided you get it in an individual capacity. I don't like to guess or predict what the Supreme Court's going to do, but there's a case called Landor. I don't think it's going to go there. Right. And so if Landor does not go in the favor of Landor in that case, then he wouldn't be able to receive damages under RLUIPA, but I believe he would be able to receive damages under Section 1983 in their individual capacity. You think he'd get damages under 1983, that's right. Yeah, but RLUIPA, probably not. Yes, but under Section 1983. 1983, you think you got a damages claim if you get past the qualified immunity second prompt. Yes, Your Honor. So if there are no other questions, we would ask this Court to reverse summary judgment and allow for discovery regarding the VDOC's dietary policies. You want discovery? Yes, Your Honor. I thought you had discovery, you were going to go to trial. Mr. Roberts requested discovery under, regarding VDOC's. Oh, you had a request for discovery. Yes, Your Honor. But you said you got turned down. Yes. So you want us to reverse that too? Yes, Your Honor. To grant discovery regarding the history of the VDOC policies that would show essentially that they knew the diet wasn't compliant and that denying Mr. Roberts this diet. So you think the judge erred in that regard also? Yes, Your Honor. Have he mentioned everything that he did wrong now? I believe so, Your Honor. Yes, the main argument that we're putting forth here is that the judge erred in not correctly applying clearly established framework. Thank you, Your Honors. Thank you very much. And Ms. Phillips? Good morning, Your Honors. May it please the Court. My name is Mikayla Phillips and I represent the VDOC officials. This case is about a six-week window between March and April of 2020 and what a prison reasonably could and could not accomplish within that window. Mr. Roberts asked for the first time on March 10th to combine two religious accommodations that VDOC had not foreseen would be paired together. First, the kosher diet, which requires rabbinical supervision and off-site kitchen preparation. And second, the Ramadan fasting schedule, which requires meals timed to astronomical twilight. And so he'd been receiving that OJKD diet since 2019, correct? Yes. So your first prong, you're already doing that. So what's the problem? The problem is that under the Turner factors... So then it's the second, the second, you can't give it to him on the Ramadan schedule. Right. At the time, there was no... So part of the Ramadan schedule is the meals timed before twilight and after sunset. And then they also get a four-hour meal bag that is given after dinner. And the problem at the time is that VDOC did not have a meal that would be safe to eat within that four-hour window that they could just take with them. So that was the problem. But VDOC has since revised the policy. Mr. Roberts has been getting his Ramadan meals, his kosher meals on a Ramadan schedule since 2021. And that policy is still in effect today, which the court can take judicial notice of. It's March the 10th. It was 2020. Correct. And under the Turner factors, the VDOC had a serious interest in keeping inmates safe and healthy, and they simply just could not create a safe, fast and compliant meal option within that six-week window. There are several steps... Wait, so you're arguing that they had to come up with a new menu within the six-week window? Mr. Engelke's affidavit says that it needed to be reconfigured. But the new aspect is simply the meal, the third meal that would be shelf-stable within four hours and safe to eat. You argued that before the district court? I believe so, Your Honor. That was the bag that was supposed to be refrigerated. Correct. Wasn't there an affidavit from an appellant that he had received shelf-stable menu items before during the years that he was on this OJKD diet? I believe his affidavit said that that is the accommodation that was made for Ramadan 2021 and thereafter, that his position is that they could do it because they have done it since. But in 2020, when faced with this request on six-weeks notice, they didn't know if they could safely do that in that time. Did Judge Jones rule the way you're telling us here now? Yes, he concluded... The district court found things the way you cited them? I believe so, Your Honor. He found a factual finding that there was a shelf-stable meal bag, but that the district court found that, crediting Mr. Engelke's affidavit, that it could not be provided in 2020. They couldn't satisfy the requirement. Correct. So, under the ruling of Judge Jones, there's no need for a trial. Correct, Your Honor. And there's no liability. Right. And this goes back to the qualified immunity analysis, too. At the time, there was no clearly established law from either the Supreme Court of the United States, this court, or the Supreme Court of Virginia that would have created or that clearly established that a Sunni Muslim inmate had a constitutional right. That's if you define it that way, that narrowly. I mean, that's very specific to this situation, very narrow. Why wasn't the clearly established right, the right to a nutritionally adequate diet that is consistent with his religious beliefs? I have two points to that, Your Honor. Under the Supreme Court's case law in White v. Pauley, Mull and X. Briseau, the court has stated, and this is a direct quote from White v. Pauley, the clearly established law should not be defined at a high level of generality. It must be particularized to the facts of the case. And the facts of this case. But not so narrowly that it only would apply to this one singular situation. Well, although in a general circumstance, the prisoner has a clearly established right to the diet consistent with religious scruples, the court also considers the Turner factors. And in Wall v. Wade, this court said, absent a legitimate reason to the contrary, they have this right. And in this particular circumstance, it was justified and reasonable that they wanted to be able to provide a meal that would be safe and healthy enough for the inmate to eat and use their resources effectively. So within a condensed timeline that they were faced in this circumstance, it would not have been able to be used. And do you agree that both options he was provided would violate his sincerely held religious beliefs? He either has to eat a meal that is not compliant with the Ramadan fasting or not fast? Sure. So commissary options were available to him as well. And I understand and the point is well he's indigent. You're going to give him, why didn't they, if there's commissary items available, why couldn't they use those to make a shelf stable option for him to have during Ramadan? Well, under Turner, it is the inmate's burden to propose an alternative. But you acknowledge he's indigent, but at the same time, you're saying he could have gotten these things from the commissary when you know he could not have. Logically, practically, because he's indigent, unless he's going to go steal it, then we got a whole other issue. Right. So he, that's a theoretical option. He could have chosen one. It's a theoretical option. Is that sufficient to violate his sincerely held religious beliefs? No, but there are also other alternatives to practice his religious beliefs available. I understand that the diet was an issue, but under O'Loan and under this court's precedent in Firewalker Fields, the court also is one of the factors looks to whether there's also alternative means to exercise their faith. Here, Mr. Roberts could have attended services. He could study and religious texts. He could have a prayer rug. He could have a Qur'an. What's the primary religious tenet during Ramadan? Is it all these things? I mean, they can do all those. You could do all those things during, outside of Ramadan. You can read literature and all of that, but what about the fasting? And isn't that a core tenet of Ramadan? The fasting is a core tenet of Ramadan. I just don't see how reading pamphlets is equivalent to the requirement to fast or to eat an appropriate meal. Well, given the logistical hurdles of the, at the time, with six weeks notice, yes, there was nothing available. We're within, there's only so many options that were available, and the Commonwealth's position is, yes, we recognize that this. So, you're saying that, I mean, the appellant was in a KETS-22 with the options he was given, but you're saying that the prison was also in a KETS-22 because it says that it couldn't accommodate. Yes, and I think, Your Honor, it shows that VDOC wanted to do it correctly. The record shows there was another inmate that requested this at the same time, and if we didn't do it correctly the first time, I imagine we'd be here on a different circumstance where we gave food and people got sick and then got sued. So, I think from VDOC's position, they wanted to make sure they did it right and did it well, and they have done for the past six years. So, that's an acknowledgement that they did it wrong. At the time, there were logistical hurdles and safety concerns that they could not do it. So, they did it wrong because there were logistical hurdles and safety concerns? Yes. And the safety concerns were that he would get sick? Yes, and the record— Did he get sick anyway because he was forced to deal with the options he was given? Yes, because he kept food that was not safe to consume for hours on end and got sick three or four times. VDOC wants to avoid that, but they need to be given the leeway and the deference to be able to do it right. They actually tried to comply with what he wanted and he got sick? No, Mr. Roberts was saving his meals throughout the day, his regular kosher meals throughout the day until after the fast was over and then eating them and got food poisoning. He was trying to comply with the time to eat and that's why he did it and it sort of forced him to doing that. And the point that Judge Stack is saying is that while safety was a concern, it appears as though they created a situation that caused him to be sick. Whether it was his action and contributed to it or not, but if he's following his religious beliefs, a person who has sincerely held religious belief is not going to eat except at a point in time and you have to know that. You know what he practices. He's not going to eat until then, so you know if he's going to eat at all, he's going to have to hold it to that time period. Yes, Your Honor, but I think that under Turner, the decision to not give him the food in the first instance was out of safety and logistical resources as well. What's the reason for not giving it to him at a later time so that would be within a safe zone? VDOC's position is that they did not have a meal available for that third meal that's given to go that would comply with the four-hour agreement. Inmates to participate in Ramadan have to sign an agreement that says this third meal that I'm getting after dinner, I agree to consume it within four hours, so the food has to be stable and safe enough to last for that four hours. They could eat it as soon as they get it. They could eat it four hours later, but it needs to be consumed within that one day. But what I'm saying is why don't you give it to them? What was the problem with giving it to him within four hours of when he had to break fast when he would have eaten it so it was within the time? Like give the to-go meal later. Well, sure, the hot meals that were given for before sunrise and after sunset had to be consumed within 30 minutes. It is my understanding that VDOC did not have a bag option available that they could give it to him at dinner that would still be safe four hours later to consume. I know, why don't you give it to him four hours later instead of after dinner to go? Well, I think that would create a logistical problem for VDOC in terms of timing and getting the meals out. That is like a human resources issue as well. And it's my understanding at this time that all of the meals were delivered specifically to inmate cells on the Ramadan schedule, especially because it's COVID at the time, so trying to minimize contact. You adopted Judge Thacker's suggestion that you'd done something wrong. Did you intend to do that? That you did something wrong? I thought you were trying to do the best you could. We did the best that we could, Your Honor. I acknowledge the case law says that under the free exercise clause, the prisoner has a clearly established right consistent with religious principles, but the second prong of that is whether this policy is also reasonable under Turner. That alone is not enough, which is why we need to look at the facts of this case. And Judge Jones accepted your explanation of what you've done as being the best you could do. Yes. That's the district court that's being appealed here. Yes. And you're saying that you all did argue to Judge Jones that you could not create a new menu? I don't know that it was specifically argued to him, but . . . Are you okay? I didn't think it was, and I thought I heard you . . . at least I got the impression that you were saying that it was argued below. But we can't create a new menu in that time frame was not argued below? Mr. Engelke's statement, which the district court was attached . . . which was attached to the commonwealth's motion for summary judgment, specifically said that the menu had to be reconfigured. That's a quote, reconfigured. And I take that to mean that it's this fourth meal, that that's the new menu. It had to be reconfigured to create something that was compliant. Well, let's address at least the threshold issue. Judge Jones did not address the Turner factors at all. Correct. And I think, if you will, discuss and parse between the differentiation of the claim of the Religious Land Use Type Act versus the First Amendment arising under Section 1983. It just seems to me, you know, even with the religious and damages is what you're seeking, I just don't think it's available in official capacity. As I discussed earlier, it looks to me down the pipeline, not going to be an individual either, unless the Supreme Court does something that surprises me on it in the London case. But then you go to the First Amendment, and the First Amendment is tough for a prisoner, because there are very, very few rights that the Supreme Court allows, you know, when you view the Turner factors in that way. So what do we do? Do we send it back to the district court, because it did not look at the Turner factors, to do that? No, I believe this court can do the Turner analysis itself. It's a question of law, and the facts are within the record for this court to look at. You've got to look at facts to be able to do that. Law is Turner, yeah, it tells you to do it. But to actually do it is a trial court function. I mean, it just seems clear, if you did not address it at all, and you mentioned Turner over and over and over, I've been hearing that over, and yet the district court never even mentioned it. I mean, so that seems to be there. And, you know, of course, as we've discussed, even at the end of the day, you get there, then you've got to deal with the clearly established aspect of it, which really kind of separate questions in and of themselves, but at least from the constitutional perspective, it just seems like the Turner factors need to be addressed. Whether result changes, I think at the end of the day, the Turner factors are strong. I don't know how you overcome those to establish that claim, but nonetheless, it should be addressed. Well, this court can decide not to address the Turner factors and simply decide that the law was not clearly established to avoid a remand situation. Yeah, we know that. We've already discussed that part about it. It doesn't help the law when we bounce away. A tough question. It doesn't help in terms of establishing something for the next time it's clearly established. In fact, it probably says, go keep doing the same thing over and over again because it won't ever be clearly established. So you're telling us not to clearly establish if we believe that there is a potential violation, but I'm not simply saying the remand is something that's potentially, but you said don't go there if we can affirm on the clearly established. Well, it seems like it would be somewhat of a do. The Commonwealth wants this court to affirm the district court's decision. Affirm Judge Jones across the board. Yes. Yes, Your Honor. In a way we can. Short and sweet. Short and sweet to the point. Affirm. Short and sweet. The injunctive relief claims are out. This has been moot, so there's no point to remand on that. The policy has been changed and he's been getting the exact relief that he wants for five years now. The RLUIPA damages issue, Mr. Roberts filed a notice waiving that point. So on remand, no damages in their individual capacities. The Supreme Court hasn't decided. They've waived that issue. They filed a notice. And then on the free exercise clause, I think you just get into the clearly established prong. There's no need for a remand. You're sticking with affirm? Yes. All right. So you've settled on that position? Yes, Your Honor. If this court has no further questions, then I'd respectfully ask this court to affirm the district court's decision. Thank you, Ms. Phillips. Ms. Stelkus? Good to have you with us. Good to be here, Your Honor. Now, are you all third-year students? We are, yes. You're about to graduate, or you already have? Oh, we graduate in about a week. In a week? Yes. That's wonderful. Then you have to take a bar exam of some kind? Oh, yeah. That's next on the docket. But you're already trained. Special Courts has already got you ready for that. Yes, we're very much prepared, I hope. May it please the court, good afternoon, Your Honors. Let me ask a threshold question, just to be clear. When I read this, I thought it was a question of whether there was notice in June of 2019, and then you had a 2020. But if I heard correctly earlier, March 2020 is the date now that we settled on. Yes, Your Honor. So there's no factual issue? Is that true or not? Not necessarily, Your Honor. The March 2020 date is important because that is what defendants are saying made it impossible for them to create this new menu, that by the time they realized, in their words, that Roberts required the OJKD on the Ramadan schedule, they wouldn't have had time to create this new menu. It was back in July of 2019 that he actually went on to the OJKD diet. But to Judge Thacker's point, this new menu argument and these logistical turtles and safety challenges were not addressed at the District Court below. This is an argument that they have now raised on appeal in order to create this rational link between their denial of Roberts' request and these penological interests under Turner. And I would like to say that this is not the same as creating a new menu, and there is evidence of that in the record. For example, in Engelke's declaration, he says on JA256 that Roberts' request to receive OJKD on Ramadan was denied because he signed an agreement for the Orthodox Jewish diet. It says nothing about this new menu or any of these logistical challenges. And in their brief, they define or they explain what creating a new menu would mean. And it would mean, on page nine of their appellee's brief, in order to create a new Orthodox Jewish menu. And by their explanation of new menu in their brief, you mean here, because they didn't say any of this below. Yes, sorry, apologies. No, I just wanted to make clear. In the brief to this court, they explain that creating a new menu would require them to consult with the Muslim and chaplain services of Virginia to design a new menu. And after designing it, they would need time to order and purchase the necessary food. That's how they're defining new menu, which is not how they then, which is not how Engelke defines reconfigure or how the district court looked at reconfigure. The district court says that in subsequent year, in 2021, that the OJKD meals were just served on the Ramadan schedule. And that on page 257 of the record, Engelke says that when they finally did accommodate Robert's request, they reconfigured the OJKD such that Muslim inmates who had been on OJKD would simply to simply continue to receive that menu or that diet on the Ramadan schedule. So conflating reconfigure and new menu just isn't accurate and is not reflected in their briefs to this court or in the district court opinion. Looking also at the district court opinion, the footnote that the district court cites in support of defendant's new menu theory is unsubstantiated. There are no facts in this footnote that actually support the claim that defendant is on page 417 of the record. Um, and because the defendant's record, you mean the J.A.? Yes, apologies. The joint appendix. The joint appendix. It's different than the record. You're correct. You might need to know that for the bargain. My apologies. In the joint appendix. Um, and because the defendants didn't make this new menu argument before the district court, the district court basically speculates in saying that it would have required advanced planning, nutritional research, and other requirements, but there's no site in that footnote to support that statement. And under a summary judgment posture where the facts must be taken in the light most favorable to the non-movement, they're basically taking the facts such as an Engelke's declaration in defendant's favor, which is improper. And lastly, your honor, looking to the first prong of the clearly established right of qualified immunity. But what about the Department of Corrections points out that they wanted to do it correctly. They had been trying to accommodate, they had in fact been accommodating him since 2019, and then they were, and today I guess, still accommodate the Ramadan schedule. Um, but they, they just, isn't that some indication that they just could not accommodate him? Your honor, looking at the contemporaneous rationale for why they denied Robert's request, they say nothing about attempting or taking that month to try to accommodate his request. They simply just flat out say that the OJKD wasn't available for Ramadan. So at the time of the denials back in March of 2020, there's no evidence to suggest that that is what they were trying to do or that they were trying to accommodate him. And it would be improper to now speculate retroactively. Um, but returning to the first prong of the qualified immunity analysis, as discussed, defendants are attempting to narrowly define the clearly established right to fit the exact factual circumstances of this case. And that's all Roberts is asking is for this court to apply. Oh, I see. I'm out of time. Your honor. Go ahead and finish your right. Thank you. Roberts is simply asking this court to apply its own precedent from Lovelace and holding that he has a clearly established right to a diet consistent with his religious scruples. And this is not too high or too general of a definition. The court in Winfield v. Vass said that it was overgeneralized to say a defendant had a right to personal security. And that would be as if Roberts was arguing he had a right to religious freedom, which is not the case. And so the definition in Lovelace is the appropriate middle ground in holding that he has a clearly established right. Therefore, Roberts respectfully requests that this court reverse the district court opinion and remand for further proceedings. Thank you very much. Thank you. We appreciate your work. Good to have you with us. Good luck down the road. We'll come down and greet counsel and adjourn for the day.
judges: Robert B. King, James Andrew Wynn, Stephanie D. Thacker